UNITED STATES of America, Plaintiff–Appellee,

v.

Armando BELTRAN, Defendant–Appellant.

No. 96–1271.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1996.

Decided March 21, 1997.

Barry Rand Elden, Chief of Appeals, Eddie Stephens (argued), Office of U.S. Atty., Criminal Appellate Division, Chicago, IL, for plaintiff–appellee.

Michael F. Lefkow (argued), James Slater, Chicago, IL, defendant–appellant.

Before EASTERBROOK, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Armando Beltran claims he sold cocaine only once, and then only for a good cause. He pleaded guilty; but at sentencing the district court declined to provide either a downward departure or a downward adjustment in Beltran's offense level for being a "minor or minimal participant." Because he believes the court unfairly relied upon certain information in arriving at these decisions, Beltran appeals. We affirm.

## I.

Armando Beltran ("Beltran") pleaded guilty to selling cocaine. The facts of the sale are straightforward. A witness who was cooperating with the FBI ("CW") approached Marcelino Salgado about purchasing one-quarter kilogram of cocaine. Salgado agreed to sell him the cocaine for $6,500 and arranged for CW to come to a brown house, the location of which he described to CW. The following day, at the pre-arranged time, CW arrived at the house and knocked on the door. Beltran answered, told CW that Salgado had just left, and invited CW inside. After telling CW that he would telephone Salgado, Beltran placed a brief call and hung up. A short time later the phone rang and Beltran engaged in a short conversation with the caller, during which he described both CW and CW's car. After Beltran completed the call, his sister, Mayra, also placed a brief call and received a phone call back. When she completed her call she told her brother that Salgado said to give CW anything he wanted and she told CW that he could call Salgado later.

Beltran asked CW what he wanted and was told a "quarter." Beltran walked to the kitchen and returned a short time later with a brown paper bag, which he placed on the table near CW, saying "Here it is." CW paid Beltran $6,500, and left the brown house with the brown bag. Inside, agents found 254 grams of 80% pure cocaine.

Eventually, Beltran was indicted. Count one charged him with conspiracy to possess with intent to distribute the single sale of "approximately 250 grams" of cocaine. Count two charged him with distributing the same cocaine. Count three charged him with using a communication facility (telephone and electronic pager) to commit these offenses. Following unsuccessful plea negotiations, Beltran pleaded guilty to counts one and two on November 14, 1995. The following day the government moved to dismiss count three and the court accepted the plea. Sentencing was set for January 31, 1996.

Beltran met twice with the probation department prior to its preparation of a presentence report ("PSR"). On January 29, two days before the sentencing hearing, Beltran's counsel sent the probation office a letter and filed with the court a sentencing memorandum containing objections to the PSR. In the letter, counsel represented that Beltran wished to supplement the facts and if given the opportunity would testify that he knew nothing of the cocaine sale until the day of the transaction. In the letter, Beltran for the first time recounted that his brother in Mexico had been hospitalized following a motorcycle accident and required $4,000 for an emergency operation. The family in Mexico could raise only $3,000, and called upon Beltran and his sisters in the United States to come up with the $1,000 shortfall. Beltran approached Salgado, a family friend who had

once dated his sister, about obtaining a loan. Salgado told Beltran the day of the transaction that if he did him the favor of making a $6,500 cocaine delivery, Beltran could keep $1,000 of the proceeds as a loan. Beltran sold the cocaine; he sent the money to Mexico; his brother had the operation; and the operation was a success. Or so we are told.

In his sentencing memorandum Beltran agreed with portions of the PSR, such as the recommendation that he receive no obstruction of justice adjustment in his sentence (he had traveled to Mexico, either coincidentally or to flee charges, depending upon the version one accepts). He also disagreed with portions of the PSR, such as the two-level acceptance of responsibility adjustment, arguing instead for three levels. Beltran also urged the court to find he was a minimal or minor participant in the offense. He noted that although evidence indicated Salgado was involved in the drug trade, no such evidence implicated Beltran. Beltran referenced the letter to the probation department explaining why he had felt it necessary to sell the cocaine, and reiterated that until the day of the offense, he had no knowledge of Salgado's ongoing drug activity. Finally, Beltran requested that the court depart downward and sentence him below the appropriate guideline sentencing range.

At sentencing, the court accepted Beltran's late motion and ordered that Beltran's letter be added to the PSR as a supplement. It granted the three-level acceptance of responsibility adjustment sought by Beltran on the ground that because of his plea, neither the court nor the government had expended significant time preparing for trial. The court then conducted a hearing on the issue of defendant's role in the offense and his motion for a downward departure.

In response, the government attorney advised the court that just that morning the probation office had notified him that it possessed an FBI report (referred to as a "302") which had been faxed to it by the case agent, refuting Beltran's allegation that the charged offense was the only instance the defendant was involved in illegal drug trafficking. At the court's direction, the government read the relevant portion of the 302 into the rec-

ord. The 302 recounted the case agent's interview with Beltran's sister, Mayra, which suggested but did not specifically state that Beltran had been involved in other cocaine sales. Beltran's counsel objected to the admission of the 302 because he had only seen it just before the hearing and therefore had been unable to discuss it adequately with his client.

The government advised the court that in addition to the drug sales suggested by the 302, while CW was inside Beltran's residence he had witnessed another person arrive and discuss purchasing a "kilogram" with Beltran's sister after she let him into the house at Beltran's direction. The government further argued that Beltran's familiarity with drug lingo and the presence of a scale in the kitchen suggested that the sale to CW was not an isolated event. Beltran's counsel contended that the scale was not his client's but rather had been given to Beltran only that morning for the CW sale. Despite the dispute over whether Beltran had been involved in other sales, and despite the fact that he had not yet had an adequate opportunity to discuss the 302 with his client, Beltran's counsel never sought a continuance and the court proceeded with sentencing.

The court found that Beltran had not established he was a minimal or minor player in the offense; it made explicit findings on the record in support of this determination. None of the findings specifically related to the information contained in the 302. Instead, the court focused on "the specific transaction [ ] involved in this case," and its conclusion that "Beltran was a knowing, willing and full participant in this particular transaction." Contrary to the suggestion the government sought to glean from the 302, the court observed that there was no evidence that Beltran was in the narcotics distribution business. The court further noted that Beltran's motive for selling the cocaine, while relevant to a departure, was not relevant to a minor or minimal role in the offense adjustment. With regard to a downward departure, the court accepted Beltran's explanation for why he had sold the cocaine but noted that despite Beltran's unfortunate family situation, "those circumstances [did not]

justif[y] your participation in this event or diminish your culpability in the case." Because he had no prior criminal record, was educated, and had apparently "[never] acted as a professional drug dealer," the court sentenced Beltran to the lowest end of the guideline range, 24 months. After sentencing, Beltran's counsel preserved his objection to the admission of the 302 on the grounds he had not seen it until earlier that day and had not had sufficient opportunity to discuss it with his client. The court overruled the objection. In doing so it described the 302 as "highly relevant." However, the court noted that it had based the sentence not on the 302 but on all the facts and circumstances of the offense in the record.

## II.

On appeal, Beltran argues the district court improperly accepted the 302 into the record and denied him his right under the Constitution as well as the Sentencing Guidelines to subpoena witnesses and prepare rebuttal to the allegations contained within the 302 prior to the imposition of sentence. Beltran argues that prior to the improper admission of the 302, "the uncontested facts supported a finding that defendant was a minimal participant in the offense." Because of the court's consideration of the 302, Beltran contends he was denied an adjustment under U.S. Sentencing Guideline § 3B1.2 for a mitigating role in the offense.

A defendant is entitled to advance notice of the evidence upon which the court intends to base its sentence where that evidence is disputed. U.S.S.G. § 6A1.3(a) & (b); *United States v. Cantero,* 995 F.2d 1407, 1412, 1413 (7th Cir.1993). That is why a PSR is prepared in advance and why both parties are provided an opportunity to object to both the facts and the proposed guideline applications in the PSR. U.S.S.G. § 6A1.3; *Cantero, id.* Of course those objections are supposed to be filed sometime earlier than two days before the sentencing hearing. It is a bit disingenuous for Beltran to complain that the government somehow surprised him with the 302 when that 302 was introduced in response to his own last-minute supplemental letter and motion objecting to the PSR.

Nevertheless, the court formally accepted both Beltran's letter and motion into the record at sentencing. The 302 relating to the FBI's discussion with Beltran's sister, herself a target of the investigation, had never been disclosed to Beltran earlier because it was neither exculpatory, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), nor required under the Jencks Act, 18 U.S.C. § 3500(b) (requiring that the United States produce prior statements by witnesses after they have testified at trial). It became relevant only when Beltran submitted his letter describing his motive for participating in what he described as a one-shot cocaine sale.

■■■ Beltran attempts to show that either the Constitution or the Sentencing Guidelines entitles him to an opportunity to subpoena witnesses to contradict evidence contained within the PSR, or in this case within the supplemented record. He has no such right. *Cantero,* 995 F.2d at 1413 ("An evidentiary hearing need not be afforded on demand because there is no 'right' to a hearing.") The decision whether or not to hold an evidentiary hearing prior to sentencing is expressly vested in the sound discretion of the district court. Fed.R.Crim.P. 32(c)(3)(A). The Guidelines do provide, however, that Beltran must be afforded an adequate opportunity to contest information important to the sentencing determination with which he disagrees. U.S.S.G. § 6A1.3; *United States v. Blackwell,* 49 F.3d 1232, 1236 (7th Cir. 1995). While this does not require an evidentiary hearing, it does require some procedure for disputing a PSR, such as the submission of affidavits. *Cantero,* 995 F.2d at 1413. Here, if the 302 was relevant to Beltran's sentence, the court could and probably should have provided Beltran an opportunity to contest the 302. At a minimum, Beltran's counsel should have been provided an adequate opportunity to discuss it with his client.

We have held that where a court relies on information not contained within the PSR to depart upward, the defendant must be notified in advance and provided an opportunity to rebut that information. We have debated whether such notice and opportunity might even be required for an upward adjustment.

*See United States v. Jackson,* 32 F.3d 1101, 1105–10, 1111, 1112–13 (7th Cir.1994) (opinion by Coffey, J.; Posner, C.J. and Kanne, J. concurring separately) (disagreeing with that portion of opinion holding that opportunity to rebut evidence must be afforded for upward adjustment). But we are aware of no precedent discussing whether a defendant must be provided that same notice and opportunity to rebut evidence that at best serves only to limit the possibility of a downward adjustment.

We need not reach the issue here, however, because in this case the record reveals that Beltran's counsel never requested either an evidentiary hearing, an opportunity to rebut the 302, an opportunity to consult with his client, or a continuance so as to investigate the question further. In fact, Beltran's counsel did not object to the court's consideration of the 302 on any ground other than that he had not seen it until shortly before the hearing. When a "defendant does not request a continuance after receiving belated discovery, 'a court can often assume that counsel did not need more time to incorporate the information into the defense's game plan.'" *United States v. Ivy,* 83 F.3d 1266, 1281 (10th Cir.) (quoting *United States v. Sepulveda,* 15 F.3d 1161, 1178 (1st Cir. 1993)), cert. denied, —— U.S. ——, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996).[1]

Despite the district court's offhand statement that the information in the 302 was "highly relevant" in response to defense counsel's renewed motion to strike it, our review indicates otherwise. In fact, the 302 had no relevance whatsoever to the question of Beltran's role in the offense, and played no role in the court's denial of a downward departure.

Sentencing Guideline § 3B1.2 directs the court to provide a four-level reduction in offense level if the defendant was a minimal participant in the criminal activity and a two-level reduction if he was a minor participant. "When a defendant requests a decrease in his offense level, he has the burden of demonstrating that he is eligible for the reduction by a preponderance of the evidence." *United States v. Nobles,* 69 F.3d 172, 190 (7th Cir.1995) (quoting *United States v. Soto,* 48 F.3d 1415, 1423 (7th Cir. 1995)). The Guidelines note this determination is heavily dependent on the facts of the case, "which implies a correspondingly limited appellate role." *United States v. Burnett,* 66 F.3d 137, 140 (7th Cir.1995). The defendant must show he was a minimal participant because he was "plainly among the least culpable of those involved in the conduct of a group," or a minor participant because he was "less culpable than most other participants." U.S.S.G. § 3B1.2, comment. (nn.1, 3). It is intended that these downward departures be used infrequently. *Id.,* comment. (n.2).

Beltran failed to demonstrate he was a minor or minimal participant. While a defendant's lack of knowledge or understanding of the structure of an enterprise or the activity of others is indicative of a minimal role, a defendant is not eligible for the reduction "just by being at the end of the chain of distribution, by being a courier, or by serving as a go-between rather than a principal." *United States v. Willis,* 49 F.3d 1271, 1275 (7th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 136, 133 L.Ed.2d 84 (1995). In this respect, because he was only charged and held accountable for the one transaction in which he admittedly was involved, Beltran played an integral and significant rather than a minor role in the offense for which he was held accountable. *United States v. Lampkins,* 47 F.3d 175, 181 (7th Cir.) ("[I]t makes no sense to claim that one is a minor participant in one's own conduct."), cert. denied, —— U.S. ——, 115 S.Ct. 1440, 131 L.Ed.2d 319 (1995). The government did not charge Bel-

---

1. Beltran also argued that the 302 did not meet the minimum indices of reliability required by the Guidelines. *United States v. Beler,* 20 F.3d 1428, 1432 (7th Cir.1994) (defendants possess due process right to be sentenced on the basis of reliable evidence). This objection was not presented to the district court and was thereby waived. *United States v. Bailey,* 97 F.3d 982, 985 (7th Cir.1996) (failure to raise issue to sentencing court waives it on appeal). We review waived issues for plain error and will reverse only if an error is so egregious as to constitute a miscarriage of justice. *Id.* In any event, whether the 302 did or did not meet due process standards of reliability is not relevant to our holding and thus we need not discuss it further.

tran for the larger conspiracy or for other transactions. Nor did the court consider any larger conspiracy or other transactions as relevant conduct. Beltran's minor role in the larger conspiracy already was reflected in the minor nature of the charges against him. With regard to the specific charges at issue, the one transaction and the conspiracy to commit that one transaction, however, Beltran played a significant role. Thus, he is not entitled to a further reduction. *Id.;* U.S.S.G. § 3B1.2, comment. (n.4) (when defendant has received lower offense level "by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role ... is not warranted...."). Beltran was charged only with distributing a quarter kilo, approximately one-half pound, which he sold to CW, the government witness, for $6500. This was a significant sale and its significance would not have escaped Beltran, who the court noted (based on the PSR's account of his background, education, and occupation) was an intelligent man.

In addition, the court explicitly relied only on the one transaction in sentencing Beltran: "the facts and circumstances *as to the specific transaction that is involved in this case* suggests that Mr. Beltran was a knowledgeable, willing and full participant *in this particular transaction....*" After the defense counsel preserved his objection to the 302, the court admonished counsel not to mischaracterize the court's finding, emphasizing that it had based the sentence on a review of all the facts and circumstances of the offense charged.[2] So even if Beltran had been provided an opportunity to rebut the 302 at an evidentiary hearing, and had called witnesses who had in fact discredited Beltran's sister's reported statement, Beltran would have been left in the same position in which he ultimately found himself: the court would have considered his motions for an adjustment only in light of the single sale actually charged, which the record reveals is exactly what the court did. Therefore, even considering the

transaction and motivations most favorably to Beltran, he was not entitled to the mitigating adjustment.

■ After determining Beltran was not entitled to the downward adjustment for his role in the offense, the court considered his request for a downward departure based on Beltran's claimed need to quickly raise money so that his brother could pay for an operation. With all deference to his reported circumstances, the court determined that Beltran's family crisis did not justify his actions and declined to depart. The determination to depart downward "is wholly within the discretion of the district court [and] there is no appellate remedy if a district court chooses not to depart." *United States v. Gaines,* 7 F.3d 101, 105 (7th Cir.1993). This court lacks the authority to review a district court's refusal to depart downward unless the refusal is in violation of the law. *United States v. Franz,* 886 F.2d 973, 980 (7th Cir. 1989). To the extent the court relied on the 302 in declining to depart downward after failing to ascertain whether the 302 was reliable, Beltran might well claim that his case falls into this narrow exception. However, Beltran has not made that claim on appeal. Both his opening and reply briefs focus on the court's refusal to adjust downward to the exclusion of any argument over its refusal to depart downward. He has waived the argument. *See, e.g., United States v. Spaeni,* 60 F.3d 313, 317 (7th Cir.) (argument raised for first time in reply brief is waived), *cert. denied,* ── U.S. ──, 116 S.Ct. 536, 133 L.Ed.2d 441 (1995); *United States v. Kezerle,* 99 F.3d 867, 869 n. 2 (7th Cir.1996) (argument raised for first time at oral argument is waived). In any event, the argument would get him nowhere. Our review of the sentencing record indicates quite clearly that the district court rejected a downward departure with all deference to Beltran's family hardship. The court did not rely upon nor cite to the information contained within the disputed 302 in discussing why it would not depart. Accordingly, even had Beltran not waived the

---

**2.** Even had the court relied upon the 302 (which its colloquy indicates is not the case) without giving Beltran an opportunity to rebut it, we would still conclude, based on the entire record,

that the error was harmless. *United States v. Dawson,* 1 F.3d 457, 465–66 (7th Cir.1993). In these circumstances, Beltran simply was not entitled to the downward adjustment he requested.

argument, he would not have succeeded with it either.

Apart from the 302, numerous facts in the record would permit the district court to conclude that Beltran was more familiar with cocaine distribution than he now cares to admit. The quantity of drugs and the money involved constitute a significant sale. The quantity has further significance in that Beltran was trusted by others in the distribution network to sell such an amount. CW was invited to Beltran's house where Beltran made a phone call and described CW and CW's car. From that the court noted that Beltran was "not somebody who was unwittingly involved in a drug transaction and [who] merely performed a single task of physically transferring possession of drugs in exchange for money then passing it on to someone else who was really in control." In describing the offense to the probation officer, Beltran freely used drug lingo in describing the events, indicating a familiarity with the subject.

But suppose we disregard not just the evidence contained in the 302 but also all the other evidence. Even if we accept as true Beltran's claim that he was totally unfamiliar with the narcotics market, and only learned the morning of the sale that he was going to be distributing $6,500 worth of cocaine to CW, he still is not entitled to the minor or minimal role reduction provided for in U.S.S.G. § 3B1.2, nor to a downward departure. Beltran was charged with only the one sale. He received an appropriate sentence for that single yet significant transaction. He received the minimal sentence within the appropriate range, he received no enhancements due to other relevant conduct, and he incurred no increases from higher criminal history categories. These limiting factors fully account for the fact that Beltran sold cocaine only once.

Accordingly, we affirm the district court's imposition of Beltran's sentence.

**ILANA DIAMOND ROVNER, Circuit Judge, dissenting.**

This case is first and foremost about procedural fairness. The question before us is not whether Beltran was entitled to an offense level reduction for being a minimal or minor participant in the cocaine sale, or whether the district judge committed clear error in denying him that reduction.[1] It is instead whether Beltran had the right to a reasonable opportunity to review and contest evidence that the district court found "highly relevant" to its decision to deny Beltran the reduction.

I agree wholeheartedly with my colleagues that the district court should have given Mr. Beltran the opportunity to contest the FBI 302, including, at the very least, the opportunity to review that report with his attorney. *Ante* at 369. That 302 suggested that Beltran's participation in cocaine trafficking was not limited to the single occasion charged in the indictment. Indeed, one may reasonably infer from the witness statement summarized in the 302 that Beltran had frequent covert discussions with the seller of the cocaine, Marcelino Salgado, and repeatedly assisted him with sales of cocaine at the Beltran residence. Thus, the 302 indicated not only that Beltran participated in narcotics trafficking on a regular basis, but that he played a much more knowledgeable and responsible role in that trafficking than the facts underlying the offense of his conviction may have revealed. Not incidentally, the report also minimizes Mayra Beltran's own involvement in this activity, making it appear that she was much more of an innocent bystander than her brother.[2] Given the extent to which it undercut Beltran's claim of having played only a transient and incidental role in the distribution of cocaine, the 302 not surprisingly was the centerpiece of the government's opposition to granting Beltran a reduction for being a minimal or minor participant in the offense. Yet, having had

---

1. I do not address the district court's decision to deny Beltran a downward departure because Beltran is not appealing that aspect of the sentencing. *See* Beltran Br. 10.

2. Mayra Beltran was arrested along with her brother, but on the government's motion, the complaint was dismissed as against her only. Given the favorable treatment she received, there are grounds to question Mayra Beltran's credibility in implicating her brother.

virtually no opportunity to discuss the report with his client, let alone investigate the veracity of Mayra Beltran's statement, Beltran's counsel could do nothing to lift the damper that the report placed on the request for a section 3B1.2 reduction.

My colleagues appear to fault Beltran's counsel for not seeking a continuance (*ante* at 368, 370), but the district court could not possibly have labored under any misimpression as to his need for additional time to respond to the 302. Indeed, the sentencing hearing opened with the *government's* motion for a continuance in order to complete the record as to Beltran's role in the offense, and Beltran's attorney expressly joined in that request:

> I have no objection to Mr. Stephens'[ ] motion on behalf of the prosecution to have an extension of time. I feel that the matter should—this is a fact-laden[ ] case. It should be fully developed.

Sentencing Tr. 4. When the district judge said that she was not convinced that there were any material factual disputes that would necessitate a continuance, Beltran's counsel added:

> Okay. And I did want to say, too, Judge, that I received at twenty minutes before 2:00 today a 7–page fax from Mr. Stephens relating to things he might want to develop at the hearing today. And I have not had a chance to explore them with my client or the witnesses. And perhaps that won't be necessary, Judge. I just want to let you know about it.

*Id.* Later in the hearing, when the parties and the court turned their attention to the contents of the 302, Beltran's counsel in unequivocal terms made clear that he could not respond to the report:

> MR. LEFKOW: First of all, Judge, I would like to object to the use of it because it was not presented to me before today and I have not had a chance to consult my client about it or to get his interpretation.
>
> THE COURT: Wasn't it given to you with 2.04 materials? [3]

> MR. LEFKOW: No, Judge. I have never seen this before. That's why I think it is unfair to use it against my client today because I'm really not prepared, other than sort of off-the-cuff remarks and without even consulting my client to discuss this in an intelligent way with you that would be helpful to the Court.

Sentencing Tr. 20–21. Finally, after the court had ruled on the 3B1.2 question and sentenced Beltran, Mr. Lefkow again made clear that he had not had an adequate opportunity to investigate and respond to the 302.

> MR. LEFKOW: One thing further for me, Judge. Much earlier in the sentencing hearing Mr. Stephens used a memorandum that I have not seen before I walked into the courtroom today. I objected to its use and I would like its use be stricken from the record.
>
> THE COURT: Are you talking about the 302?
>
> MR. LEFKOW: I think it was a 302.
>
> THE COURT: Well, it has been read into the record.
>
> MR. LEFKOW: I understand, I just want my objection to be noted.
>
> He also—
>
> THE COURT: That objection is overruled in terms of what was in the 302. I asked him to read it into the record. He was just going to hand it up to me but I thought it was important to make the basis for his position about the nature of the defendant's participation of record. And I found that information was highly relevant. So the objection is overruled.

Sentencing Tr. 47. I do not see what more Beltran's counsel possibly could have done under these circumstances. Invoking the magic word "continuance" was hardly necessary, for it could not have been more clear to the court that he needed more time to review and investigate the 302. Both the government and the defense had from the start urged the court to continue the hearing to a later date, and from virtually the first moment of the hearing until the last, Beltran's

---

3. Local Criminal Rule 2.04 directs the parties to a criminal case to meet within five days after the arraignment and, among other things, compels the government to grant the defendant's attorney access to certain materials.

counsel reminded the court that he was unprepared to address the belatedly produced 302.

Nor do I think we can say with any confidence that the district court placed no reliance on the 302; in several respects the record actually suggests the opposite. It is true enough, as my colleagues point out, that when the district court denied the mitigating role deduction to Beltran, it purported to rely solely on the facts and circumstances surrounding "the specific transaction that is involved in this case." Sentencing Tr. 28–29. Standing alone, the court's reference to the single transaction underlying the charges in the indictment tends to indicate that it placed no reliance on the contents of the 302, which went beyond that one transaction. Yet, when one looks at the whole of the court's remarks, it is far from clear that the court disregarded the 302. The easiest thing for the court to have done, of course, was to have explicitly said that it placed no reliance on that evidence. In my experience, district judges often do just this in the face of last-minute disputes over evidence that they find is unnecessary to their sentencing determinations. The judge here did not do this, notwithstanding the parties' joint belief that they would need more time to address the issues raised by the 302 and notwithstanding Beltran's repeated objections to discussion of the 302. Indeed, even after the judge had delivered her decision, and Beltran's counsel renewed his objection to the 302 and asked that "its use be stricken from the record"

(Sentencing Tr. 47), the district judge overruled the objection, noting that she had "found that information [to be] highly relevant." *Id.* That response quite clearly suggests that the court *did* consider the contents of the 302.[4] And when defense counsel sought to clarify that point, he received only an ambiguous answer from the court. The court did, as my colleagues point out, admonish him not to mischaracterize its ruling, but yet again it did not disclaim reliance on the report—the court said that it "took into consideration *all* the facts and circumstances of the offense" (*id.* at 48 (emphasis supplied)), but it did not exclude the allegations in the 302 from the universe of facts and circumstances that it considered.[5] At best, the court's remarks are contradictory and ambiguous. But in my view, the judge's unwillingness to say simply "I did not rely on it" precludes us from finding that she did not.[6]

Nor, finally, can I agree that the 302 was irrelevant as a matter of law, as my colleagues appear to suggest. *See ante* at 370–71, 372. The majority emphasizes that Beltran was charged solely with the one transaction in which he admittedly participated and reasons that " 'it makes no sense to claim that one is a minor participant in one's own conduct.' " *Ante* at 370 (quoting *United States v. Lampkins,* 47 F.3d 175, 181 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1440, 131 L.Ed.2d 319, and *cert. denied,* —— U.S. ——, 115 S.Ct. 1810, 131 L.Ed.2d 734 (1995)). Yet, as my colleagues also recog-

---

4. The court's observation as to the relevance of the 302 can hardly be described as "offhand" (*see ante* at 370) given that it came on the heels of the court's ruling and in response to the defendant's request that the 302 and any use of it be stricken from the record.

5. The majority states that "the court noted that it had based the sentence *not on the 302* but on all the facts and circumstances of the offense in the record." *Ante* at 369 (emphasis supplied). I see nothing whatsoever in the district court's remarks disclaiming reliance on the 302, however. The relevant dialogue went as follows:

> MR. LEFKOW: I am just trying to clarify the record, Judge, in case my client should wish to appeal, as to whether or not [the information in the 302] formed a part of the basis of your decision. I think you just told me that it was highly relevant, so apparently it did.

> THE COURT: Do not mischaracterize my ruling, Mr. Lefkow. I took into consideration all the facts and circumstances of the offense. I explained in some detail what they were, including the fact that Mr. Beltran's residence was used as a drug house for the distribution of drugs, and all the other reasons I stated. Sentencing Tr. 47–48.

6. The court's findings as to Beltran's role in the offense also suggest that the court took into account the 302. In articulating the reasons for denying Beltran a reduction, the court twice mentioned that Beltran's home had been used as a "drug house." Sentencing Tr. 28, 48. Perhaps one could call a home that was used *once* as the location for a drug sale a "drug house," but to my mind that term naturally suggests a finding that the house was used repeatedly for that purpose, and that in turn suggests that the court relied on the 302.

nize, the propriety of a section 3B1.2 reduction is "heavily dependent on the facts of the case...." *Ante* at 370; see United States Sentencing Commission, *Guidelines Manual,* § 3B1.2, comment. (backg'd) (Nov.1995). Simply because the defendant played some culpable role in the offense of conviction does not preclude a reduction under section 3B1.2; the pertinent question is his degree of culpability *relative* to the other individuals who participated. *E.g., United States v. Soto,* 48 F.3d 1415, 1423 (7th Cir.1995) (" 'A defendant's relative degree of culpability ... is of primary consideration.' ") (quoting *United States v. DePriest,* 6 F.3d 1201, 1214 (7th Cir.1993)). One criminal transaction could have many participants—some essential to its success, others not; some fully aware of the scope of the criminal enterprise and responsible for managing its affairs, others not. In this case, at least two people other than Beltran were involved in the sale of the cocaine to the cooperating witness: Salgado and Beltran's sister Mayra. Beltran's claim of being the least culpable among these three is at least consistent with the facts that my brothers have recounted: although it was Beltran who reported the CW's arrival at the Beltran home, described him to Salgado by telephone, and ultimately handed over the cocaine in exchange for the money, it was Salgado who negotiated the deal, and it was Mayra Beltran who told her brother to give the CW anything he wanted after her own telephonic conference with Salgado. *See ante* at 367. Make no mistake, I am not arguing that Beltran was necessarily entitled to a reduction under these circumstances, or that it would have been an abuse of discretion to deny him that reduction; I simply disagree that under no view of the facts could the district court reasonably have found him to be a minimal or a minor participant. In that regard, I view the 302 as pertinent, because if its contents are believed, then Beltran was a much more knowledgeable and intimate participant in Salgado's drug trafficking than the facts underlying this one transaction might on their face have made him out to be. And because the record is undeniably ambiguous as to whether the district judge relied on the 302, I believe Bel-

tran entitled to a new sentencing hearing, prior to which the district court could either deem the 302 irrelevant (as my colleagues do post hoc) or give the parties a full and fair opportunity to flesh out the record as to the assertions contained in that document.

"When a reasonable dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information." *Guidelines Manual,* § 6A1.3, comment. Necessary to such an opportunity is reasonable advance notice of any evidence upon which the court might rely in resolving the dispute. *Ante* at 369; *see United States v. Cantero,* 995 F.2d 1407, 1413 (7th Cir.1993); *United States v. Morales,* 994 F.2d 386, 389 (7th Cir.1993). What is clear from the record before us is that neither party was prepared to go forward on the issue of Beltran's role in the offense. What is also crystal clear is that the defense was entirely unprepared to address the 302, which the government had produced only moments earlier. Yet, in the face of repeated objections to the 302 on that basis, the district court not only invited the prosecutor to read the 302 into the record, but denied Beltran's motion to strike it because the court viewed it as "highly relevant." When the defense gave the court a final opportunity to clarify whether or not it had relied on the 302, the court, rather than disavowing consideration of the 302, merely said that it had considered "all" of the facts and circumstances surrounding the offense. If the court had either granted the motion to strike or clarified that it did not rely on the 302, this would be a different case. We cannot re-write the record before us, however. The district courts's remarks suggest that it may well have relied on the 302 in denying Beltran a reduction under section 3B1.2 without first giving him the opportunity to review, investigate, and respond to the information therein. If so, Beltran was deprived of the rights to which the Guidelines and due process entitle him.

I therefore respectfully dissent.